COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                 FORT
WORTH

 

 

                                       NOS.  2-07-393-CR

        2-07-394-CR

 

 

DANA A. MCCRAY                                                              APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

        FROM CRIMINAL
DISTRICT COURT NO. 4 OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------








Appellant Dana A. McCray appeals his convictions
for aggravated assault of a public servant and aggravated assault with a deadly
weapon.  In three points he challenges
the factual sufficiency of the evidence to support both convictions, contends
the trial court erred by denying his Batson challenge, and claims the
trial court improperly denied his requested instruction on self-defense against
multiple attackers.  We affirm.

                                            Background

Appellant began arguing with Carlos Toledo in the
parking lot of a convenience store after appellant=s car
almost collided with Toledo=s friend=s truck,
which Toledo had been standing next to. 
Two undercover Fort Worth police officers tried to intervene.  After appellant stabbed Toledo and one of the
officers, the other officer shot appellant.

                                        Factual
Sufficiency

In his first point, appellant challenges the
factual sufficiency of the evidence to support both convictions.  Specifically, he contends the evidence is too
weak to support his convictions.[2]

Standard of Review








When reviewing the factual sufficiency of the
evidence to support a conviction, we view all the evidence in a neutral light,
favoring neither party.  Neal v.
State, 256 S.W.3d 264, 275 (Tex. Crim. App. 2008), cert. denied, 129
S. Ct. 1037 (2009); Watson v. State, 204 S.W.3d 404, 414 (Tex. Crim.
App. 2006).  We then ask whether the
evidence supporting the conviction, although legally sufficient, is
nevertheless so weak that the factfinder=s
determination is clearly wrong and manifestly unjust or whether conflicting
evidence so greatly outweighs the evidence supporting the conviction that the
factfinder=s determination is manifestly
unjust.  Lancon v. State, 253
S.W.3d 699, 704 (Tex. Crim. App. 2008); Watson, 204 S.W.3d at 414B15,
417.  To reverse under the second ground,
we must determine, with some objective basis in the record, that the great
weight and preponderance of all the evidence, though legally sufficient,
contradicts the verdict.  Watson,
204 S.W.3d at 417.








In determining whether the evidence is factually
insufficient to support a conviction that is nevertheless supported by legally
sufficient evidence, it is not enough that this court Aharbor a
subjective level of reasonable doubt to overturn [the] conviction.@  Id. 
We cannot conclude that a conviction is clearly wrong or manifestly
unjust simply because we would have decided differently than the jury or
because we disagree with the jury=s
resolution of a conflict in the evidence. 
Id.  We may not simply
substitute our judgment for the factfinder=s.  Johnson v. State, 23 S.W.3d 1, 12
(Tex. Crim. App. 2000); Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim.
App. 1997).  Unless the record clearly
reveals that a different result is appropriate, we must defer to the jury=s
determination of the weight to be given contradictory testimonial evidence
because resolution of the conflict Aoften
turns on an evaluation of credibility and demeanor, and those jurors were in attendance
when the testimony was delivered.@  Johnson, 23 S.W.3d at 8.  Thus, unless we conclude that it is necessary
to correct manifest injustice, we must give due deference to the factfinder=s
determinations, Aparticularly those
determinations concerning the weight and credibility of the evidence.@  Id. at 9.  Our deference in this regard safeguards the defendant=s right
to a trial by jury.  Lancon, 253
S.W.3d at 704.

Applicable Facts

Carlos Toledo

Toledo, the victim of the aggravated assault with
a deadly weapon, testified that after work on June 15, 2006, he went to a
convenience store on Lancaster and Beach Streets in Fort Worth around 7:00 or
8:00 p.m.  His friend Isidro Salazar was
driving the truck the two were riding in; Salazar parked the truck close to the
store=s
entrance.  Toledo went inside to make
some purchases.  After he came back out,
he went to get back into the passenger side of the truck.  As he was trying to get in, a man was backing
out a car in the next space and almost hit the back of the truck.  Toledo told the man to be careful, and the
man Aapproached
[him], and he cussed [him] and then stabbed@ him
with a knife.








The man tried to stab Toledo again, but Asome
police officers came and stopped him.@  Toledo said they identified themselves as
police officers and told everyone to put their hands in the air.  Toledo jumped on the sidewalk back toward the
store.  He saw the police officers
holding the man, but he did not see appellant stab anyone else, nor did he see
the shooting very clearly because he was feeling dizzy and almost fell.  After he heard the shots, he saw the man, who
fell and ended up on the ground. 
According to Toledo, Ait was
so quick.@

On cross-examination, Toledo testified that when
the man approached him, Salazar got out of the truck and came over Ato go
close to@
him.  He did not recall Salazar having a
sledgehammer.  However, a photograph was
admitted into evidence, which Toledo identified as being the back of Salazar=s truck,
showing a sledgehammer in the back.

Chad Mills








Chad Mills, a former officer with the Fort Worth
Police Department, testified that on June 15, 2006, he and his then-partner
Officer Garrett Hull were working undercover investigating narcotics
complaints.  That night, Mills was
wearing a blue short-sleeve T-shirt, a pair of blue jeans, and a pair of Aall-purpose-type
shoes@; he and
Officer Hull would normally wear A[s]ome
sort of plain T-shirt and a pair of jeans . . . and tennis shoes@ when
working undercover so that they would not be recognized.  But Mills also wore a badge on a neck chain
under his T-shirt.

That night, Mills and Officer Hull stopped at the
store on a break to get something to drink. 
After buying a drink, Mills went outside and waited by the car for
Officer Hull to come outside.  While he
was waiting, he saw Asome sort of confrontation@ between
the passenger of a pickup truck and the driver of a car,[3]
whom he identified as appellant; he could hear the men arguing.  As Mills was watching, appellant got out of
the car Ain an
aggressive manner@ and approached the truck; at
the same time, the passenger, whom Mills identified as Toledo, got out of the
truck so that the two were face to face. 
Mills then walked around the front of the truck and started to approach
appellant and Toledo, intending to stop the fight.  As he walked toward them, Mills pulled out
his badge and identified himself as a Fort Worth police officer.  He held the badge up by his face and told
them to stop what they were doing. 
Appellant was facing Mills, and Toledo had his back toward Mills.








Mills saw appellant push Toledo; as he got closer
and the two men separated, Mills realized that Toledo was holding his
stomach.  He did not realize that Toledo
had been injured, though.  Appellant then
came toward Mills with Ahis right hand in the air as if
he were going to throw a[n] overhand-type punch@ toward
Mills.  Mills took a step back and pushed
appellant away while stepping aside trying to avoid appellant.  But appellant reached over the top of Mills=s left
shoulder and stabbed him with a knife. 
Mills tried to step back farther, but appellant lunged toward him
again.  Appellant did not stab Mills a
second time, however, because Officer Hull, who was standing behind Mills, shot
appellant twice.

Mills testified that appellant fell to the ground
after Officer Hull shot him, and the knife fell out of his hand.  But appellant quickly got back up, grabbed
the knife off the ground, and ran to the front doors of the store.  Mills did not realize he had been stabbed; he
and Officer Hull detained appellant before he could go inside the store.  They then sought medical attention for
Toledo, whom Mills realized had been injured. 
Mills did not know that appellant had stabbed him too until Officer Hull
told him.








On cross-examination, Mills admitted that he did
not see Salazar get out of the truck; he was focused on what was happening
between appellant and Toledo.  Mills
testified that Aimmediately when [he] was
identifying [himself] as a police officer is when [appellant] lunged towards
[him] with his right hand and stabbed [him] in [the] shoulder.@  He clarified that when he pulled the badge
out from under his shirt and displayed it, he also said loudly, Apolice
officer, Fort Worth police officer.@  According to Mills, the entire encounter
lasted only seconds.

When Officer Hull shot appellant, Mills heard the
shots coming from his left side.  Mills
testified that Officer Hull, who was dressed similarly to Mills, had identified
himself as a Fort Worth police officer as well. 
Mills corroborated still photographs from the surveillance camera at the
store, which indicated that the entire incident took less than one minute.

Officer Bill Yeager

Fort Worth Police crime scene officer Bill Yeager
examined the scene after the stabbings and shooting.  The State offered fourteen photographs of the
scene taken by Officer Yeager as well as a diagram that he had prepared showing
the location of the items he found.








Officer Yeager first found a fired casing under
appellant=s car.  He found a second fired casing on the ground
in front of appellant=s car, but he never did find any
bullets.  Officer Yeager also
photographed the blood trail from appellant; he said it was not a continual
stream but spots or drops without a Adiscernable
directionality.@ 
On the diagram, Officer Yeager drew the line of the blood trail around
the back of Salazar=s truck and the vehicle Mills
and Officer Hull were driving up to the front of the store.  Officer Yeager noted that there were blood
stains on the glass around the store=s front
door, the door itself, and the door handles.

On the sidewalk in front of the store, in between
Salazar=s truck
and the officers= vehicle, Officer Yeager found a
bloodstained white shirt.  Also on the
sidewalk, closer to the front door of the store, Officer Yeager found a ball
cap.  He found a cell phone in the
parking lot just outside the store=s front
doors, near the path of the blood trail. 
Immediately in front of the store=s front
doors, Officer Yeager found a knife and a cap for the knife; a blood-stained,
torn[4]
orange shirt; two earrings; a blood-stained white tank top; a blood-stained receipt;
and a blood-stained condom in a wrapper.

Officer Yeager testified that from the location
of the casings, he could tell that the bullets were shot from the area in front
of appellant=s and Salazar=s
vehicles.  He also testified that, in his
opinion, the knife was a deadly weapon, capable of causing serious bodily
injury or death.








On cross-examination, Officer Yeager admitted
that the photographs he took at the scene did not show the blood trail that he
drew on the diagram.  He also admitted
that it was Aa possibility@ that if
someone had been shot at the door, it could create a spatter such as the one he
observed on the door of the store.  When
asked if the blood spatter at the door was inconsistent with someone being
injured by the vehicles, Officer Yeager stated, 

No.  If somebody was injured, they could cause
that blood spatter to be on the doors, and there also could be a blood trail -
- whether it be two drops or 100 drops, there could actually be a blood trail
on the parking lot.  However, it was not
- - the blood trail was not photographed or projected in a photograph from my
testimony.

 

On redirect, Officer Yeager testified that the
blood on the door handle was a smear, which indicates Asomeone
already having blood on their hands and then smearing it down the handle or the
blood was already there and then they - - they smeared the blood that was
already there.@ 
According to Officer Yeager, the blood on the door was possibly
consistent with someone bleeding from the chest with blood on his hands or
someone transferring the blood to the door from bloody clothing or an
injury.  But Officer Yeager also admitted
that if blood had been on the door, the officers could have smeared it when
they walked in after the shooting.  He
also said that the blood trail he noted on the diagram that was around the
vehicles did not show up on the photographs because of a malfunction of his
camera=s flash.








Officer Yeager admitted that he did not know who
the earrings, receipt, or wrapped condom belonged to.  He simply photographed them because he found
them at the scene.  But someone told him
that the cell phone he found belonged to appellant.  There was blood spatter on the inside of the
cell phone, which was lying in the open position.

Officer Garrett Hull

Officer Hull testified that on the night in
question, he was exiting the store and going to the driver=s side
of the car when Mills got his attention. 
Mills told Officer Hull that he thought something was going on in the
parking lot.  Officer Hull then saw the
car and truck parked next to them; he said it Alooked
like there was some sort of confrontation going on between the two parties.@  But he could not hear what the men were
saying.

According to Officer Hull, he and Mills displayed
their badges and had already begun verbally identifying themselves as police
officers[5]
as they were walking around to where appellant and Toledo were standing.  Officer Hull was standing behind Mills as
Mills got between appellant and Toledo; it was then that Officer Hull saw
appellant stab Mills.  Officer Hull
described the stabbing and following events:








I . . . saw that he had made a punching-type motion to Mr. Toledo, but
I didn=t realize at that time
that he had a knife in his hand.  It wasn=t until I saw the
defendant=s hand above his head
with the knife and come down on Chad is when I observed, oh, he=s got a knife in his
hand, and I realized that he had stabbed Mr. Toledo as well.

 

. . .
.

 

[T]he whole time, approaching the situation, I was constantly
identifying ourselves as police officers trying to get it to stop.  And, at that time, I realized that the threat
was imminent, and he - - Chad - - when Chad got stabbed, he kind of pushed away
from the defendant, and the defendant was still in a real close proximity to us
and Mr. Toledo, and he still had the knife raised in an aggressive manner, so
it was an imminent threat.  And, at that
time, I drew my service weapon and fired.

 

Officer Hull said that he used deadly force against appellant because
he thought he, Mills, and Toledo were all at risk of serious bodily injury or
death because of appellant=s
actions.  Officer Hull saw the driver of
the truck, Salazar, inside the truck during the argument and also saw him get
out of the truck after the stabbing to check on Toledo; however, he never saw
Salazar with a sledgehammer.

John Salazar








John Salazar[6],
a witness who was pumping gas during the incident, testified that he saw Aa
skirmish, a fight@ in front of the store.  As he described it, the events Astarted
out with a verbal argument, and then . . . rose to a kind of shoving match to a
fight.@  According to Salazar, the two men just
started out talking to each other, then got in each other=s faces,
shouting and then shoving.  It was too
far away for him to hear what the men were saying, but he heard shouting.  When the first officer approached the men,
Salazar could tell that he was telling them something, but he was too far away
to hear exactly what.  He could not hear
whether Mills identified himself as a police officer.

Salazar testified that when Mills arrived at the
two men, he started to Abreak up the fight.@  He then took aside appellant and was talking
to him, Aand they
started putting hands on each other and then, . . . they were
fighting.@ 
According to Salazar, appellant and Mills Akind of
wrestled around a couple of seconds.@  Officer Hull then came out of the store, and
Salazar heard someone shout, A[H]e=s got a
knife@;
Salazar heard Officer Hull say freeze and saw him fire two shots a couple of
seconds later.  Salazar was certain
Officer Hull said Afreeze@ but
could only say that he thought Officer Hull also said Afreeze,
police.@[7]  Salazar did see Officer Hull=s badge
in Ahis
torso area.@








Salazar said that appellant Aran kind
of like in a half circle back towards the store door@ after
he had been shot.  In other words, he
initially ran toward the rear of the vehicles but then turned back to go toward
the store doors, which is where he collapsed. 
Salazar testified that the route he saw appellant take was consistent
with the blood trail outlined by Officer Yeager.  Salazar could not recall what direction
appellant was facing when Officer Hull shot him.  He did not see a knife in appellant=s hands,
but he was about twenty-five to thirty feet away from what was happening.

Charles Hollie

Charles Hollie testified that he had gone to the
store to buy a drink.  As he was waiting
in line, he heard Aa little bang, like a shot.@  He looked around and saw a man running toward
the store; he then heard someone say Apolice,
freeze,@
followed by another gunshot.  He saw
Officer Hull shoot appellant in the arm. 
The State questioned Hollie about the statement Hollie gave to the
police about an hour after the shooting in which he stated that he heard Apolice@ before
the first shot.  When confronted with his
statement, Hollie initially maintained that he heard Officer Hull say Apolice@ after
the first shot.  But when asked if he was
not telling the truth in the statement, Hollie said, AI really
don=t
remember ma=am.  I=m just -
- I really don=t remember.@

Victoria Van Fleet








Victoria Van Fleet, a forensic firearms examiner
with the Fort Worth Police Department, examined the T-shirt appellant had been
wearing when he was shot to determine whether holes in it were Abullet
defects@ and to
see if she could Anotice any gun powder or some
kind of residue on it to determine . . . a muzzle-to-target distance.@  She found a hole in the left arm that
appeared to be caused by the passage of a bullet; the hole was a little smaller
in the front than in the back, possibly indicating that the direction of the
shot was from the front to the back.  She
also examined a white tank top that appellant had been wearing; it had a hole
that was Aquite a bit larger@ in the
back than in the front.  She testified
that this was consistent with a hollow point bullet[8]
passing from the front to the back of the shirt because those bullets expand
upon striking something.  However, Van
Fleet also testified that she could not be sure the holes she saw in the shirts
were bullet holes; the chemical tests she ran for gunpowder and lead came back
negative.  She conceded on
cross-examination that it is possible that holes in the back of a shirt could
become bigger from a person=s lying
on the ground and being moved around.








When asked by appellant=s
counsel whether a surgeon could tell which way a bullet entered a person=s body
by the direction it was facing when the surgeon removed it, Van Fleet explained
that a bullet can rotate inside a person after entry, A[s]o
just because the direction is pointing one way does not mean that=s the
way it was fired.@ 
Also on cross-examination, the defense offered, and the trial court
admitted, appellant=s medical records, in which the
doctor treating his gunshot wound stated numerous times that one of the wounds
was to appellant=s back, exiting his left
nipple.  But Van Fleet also testified,
both on direct and cross, that the report said elsewhere that the entrance
wound was under the nipple.  In addition,
the discharge report showed that appellant had been treated for a AGSW left
chest.@

Detective Troy Lawrence

The State called Troy Lawrence, a Fort Worth
police detective.  He testified that he
interviewed three adults and one child who had witnessed some of the events at
the store.  He also retrieved the store=s video
surveillance system on a CD.  The State
offered still photos from the surveillance system.  However, none of those photos show clearly
what happened outside the store, only what was going on inside.








The State played a recording of Detective
Lawrence=s
interview with Hollie.  When asked what
he saw and heard that night, Hollie told Detective Lawrence that he heard a
shot, Apolice,
police,@ and a
second shot.  When Detective Lawrence
asked Hollie to clarify when he heard Apolice,
police,@ Hollie
initially said Aafter,@ but
then quickly corrected himself and said that he heard it before the first
shot.  According to Hollie, he heard the
first shot, saw appellant running, heard the second shot, and finally heard appellant
say, AAllright,
allright@ and
fall down in front of the door.  But he
also said that he hid after the second shot.

On cross-examination, Detective Lawrence
testified that when reviewing the surveillance tape, he could hear the gunshots
but not any talking outside the store; however, he also said that just because
the recorder did not pick up the sound of voices outside the store did not mean
that a person inside the store could not have heard them.

Appellant=s
Witnesses

Appellant called three witnesses, two of whom
testified that before the incident, appellant had been at their house to watch
television and had left sometime after 8:00 p.m. to go to the store.  Marsha Adams, a Fort Worth police
administrative assistant in the internal affairs division, testified that no
internal affairs investigation file for Officer Hull existed.

Analysis








Appellant contends that the following shows that
the evidence as a whole is too weak to be factually sufficient as to both
convictions:  (1) John Salazar, the
witness who was pumping gas at the time of the incident, heard Mills say, Afreeze,@ but
could not be sure that he heard him say Afreeze,
police@; (2)
the blood spatter on the door and the medical reports support a contention that
appellant could have been shot in the back rather than in his chest; and (3) Athe
witnesses called by [appellant] established that [appellant] appeared to have
no anger issues or an agenda when he left the house other [than] to buy beer
and return to watch a ball game.@

The jury is the sole judge of the weight and
credibility of the evidence and is entitled to resolve conflicts in the
evidence.  See Tex. Code Crim.
Proc. Ann. art. 36.13 (Vernon 2007); Johnson, 23 S.W.3d at 7.  The jury was thus entitled to believe Toledo,
Mills, and Officer Hull, who all testified that the officers identified
themselves to appellant before he stabbed Mills.  Moreover, it was also entitled to resolve the
conflict between Hollie=s in-court testimony and his
recorded statement and believe that the version of the facts in his statement
was more credible.  Accordingly, we
conclude that the fact that a different witness, who was not standing as close
to the events as the others, may or may not have heard the officers identify
themselves as such, does not render the evidence too weak to support the
conclusion that appellant knew Mills was an officer.  Moreover, this evidence has no bearing on the
conviction for aggravated assault of Toledo with a deadly weapon.








Additionally, we fail to see how where Officer
Hull shot appellant (either in the back or in the chest, or by the vehicles or
the store door) has any bearing on the credibility of the witnesses who
testified that appellant stabbed both Toledo and Mills or how it creates doubt
about his knowledge that Mills was a police officer.  The jury was entitled to believe that
appellant, having heard and seen Mills identify himself as a police officer,
nevertheless stabbed him, then attempted to flee.

Finally, although appellant contends that his
witnesses Aestablished that [he] appeared
to have no anger issues or an agenda when he left the house other [than] to buy
beer and return to watch a ball game,@ we note
that neither witness testified about appellant=s
emotional state.  They testified simply
that appellant was at their house watching a game and then left in the evening
to go to the store.  Neither was at the
store when the event occurred, and their testimony has no bearing on what
happened when appellant arrived there. 
Additionally, their testimony does not serve to weaken the testimony of
the eyewitnesses and participants.

We have detailed all the evidence from which the
jurors could have concluded that appellant was guilty of both offenses beyond a
reasonable doubt; after considering appellant=s
contentions and the evidence as a whole, we cannot say that it is so weak that
the jury=s
verdict was clearly wrong and manifestly unjust.  Accordingly, we conclude and hold that the
evidence is factually sufficient to support both of appellant=s
convictions, and we overrule appellant=s first
point.








                  Self-Defense
Against Multiple Attackers Instruction

In his third point,[9]
appellant contends that the trial court erred by denying his request for a jury
instruction on self-defense against multiple attackers.  The State contends that the issue need not be
reached because there was no evidence to support any self-defense instruction
in light of appellant=s use of deadly force.

Applicable Law








A defendant is entitled to an instruction on
every defensive issue raised by the evidence Awhether
that evidence is weak or strong, unimpeached or uncontradicted, and regardless
of what the trial court may or may not think about the credibility of the
defense.@  Allen v. State, 253 S.W.3d 260, 267
(Tex. Crim. App. 2008); see Tex. Code Crim. Proc. Ann. arts. 36.14B.15
(Vernon 2007); Quattrocchi v. State, 173 S.W.3d 120, 122 (Tex. App.CFort
Worth 2005, pet. ref=d).  A self‑defense against multiple
attackers charge is warranted if Athere is
evidence, viewed from the accused=s
standpoint, that he was in danger of an unlawful attack or a threatened attack
at the hands of more than one assailant.@  Frank v. State, 688 S.W.2d 863, 868
(Tex. Crim. App. 1985) (quoting Wilson v. State, 140 Tex. Crim. 424, 145
S.W.2d 890, 893 (1940)).[10]  Thus, the issue is whether there is evidence
that, viewed from appellant=s
standpoint, he was in danger of an unlawful attack or threatened attack from
Toledo, Mills, and Officer Hull.

Analysis








Appellant=s
requested instruction read as follows:  AThis
right of self-defense also applies when the defendant reasonable [sic] believes
that he is under attack by more than one person.  In such circumstances, the defendant has a
right to defend himself against any one or more of the persons or against all
of them.@  Appellant points to the evidence that the
entire incident happened quickly in Aa matter
of seconds.@ 
He contends that the short time frame raises the issue of whether he
perceived himself under attack from all three persons; in other words, while he
was arguing with Toledo, Mills and Officer Hull came upon him so fast that he
perceived he was the victim of a concerted group attack.  He also points to the evidence that John
Salazar, the man pumping gas at the time, saw Toledo and appellant shouting at
and shoving each other and the testimony that Mills pushed appellant first
after getting in between appellant and Toledo.

Viewing the evidence in the light most favorable
to appellant, we conclude that he has not shown he was entitled to such an
instruction, if one is even available.  See
Granger v. State, 3 S.W.3d 36, 38 (Tex. Crim. App. 1999).

The theory behind the
multiple assailants charge is that, when it is clear that an attack is being
conducted by multiple people as a group, a defendant is justified in using
force against any member of the group, even if the recipient of that force is
not engaging in conduct that would, by itself, justify the use of force (or
deadly force as the case may be).

 

Dickey v. State, 22 S.W.3d 490, 493 (Tex. Crim. App. 1999)
(Keller, J., concurring); see Black v. State, 65 Tex. Crim. 336, 145
S.W. 944, 945B47 (1912) (explaining deficiency
in charge that did not incorporate this concept).

Here, the evidence shows that appellant stabbed
Toledo before Mills got to the two men. 
Toledo and Mills, the two closest to appellant at the time, both testified
that Mills was identifying himself as an officer while approaching.  Officer Hull did not see appellant stab
Toledo, and he testified that he did not draw his weapon until after
appellant stabbed Mills.  He was behind
Mills and not involved in the physical confrontation; in fact, there is no
evidence that appellant even saw Officer Hull.








John Salazar=s
version of events does not contradict the other witnesses=
versions of the events in these respects; he simply could not confirm what was
or was not said because he was standing too far away.  He testified that Mills was already wrestling
with appellant before Officer Hull came out of the store.  He also heard someone say that appellant had
a knife before he heard shots.

Appellant=s
requested defense appears to rely on the absence of evidence rather than on Aweak or
strong, unimpeached or uncontradicted@
evidence that was actually admitted. 
Accordingly, we conclude and hold that, regardless of the availability
of the requested instruction at law, the defensive issue was not raised by the
evidence and, therefore, the trial court did not err by refusing to include it
in the charge.  We overrule appellant=s third
point.

                                         Batson
Challenge

In his second point, appellant challenges the
trial court=s ruling denying his Batson
challenge.

Applicable Facts








At the end of voir dire, the trial court called
the following veniremembers to be seated on the jury:  4, 11, 13, 22, 24, 29B31, 36,
and 38B40.  Instead of being sworn in at that time, the
trial court released the jury until the next day.  The next day, the trial court called the same
juror numbers and then administered the oath. 
Afterwards, appellant=s
counsel asked the trial court, AYour
Honor, am I to understand that a juror has changed?  No one brought that to my attention.@  The trial court then explained that the day
before, when he had called the selected jury members, number 34, who had not
been selected and whom the State had peremptorily struck, sat in the jury box
with the other selected jurors and number 40 mistakenly left with the other
discharged veniremembers.  The mistake
was corrected so that when the jury was sworn, number 40 was seated instead of
number 34.

Appellant=s
counsel then raised a Batson challenge on the ground that Athe jury
was composed of three African-Americans on yesterday
evening . . . [a]nd this morning, it=s
composed of two African-Americans.@  Juror 34 is an African-American female, and
appellant is an African-American male.








The State pointed out to the trial court that the
jury had already been sworn,[11]
but the trial court requested that the State respond to the motion
nevertheless.  The State explained that
it struck juror 34 because in her questionnaire, she indicated that her
ex-husband had been in and out of prison for years in response to a question
about whether she or someone close to her had had an unpleasant experience with
law enforcement.  The defense then
offered the questionnaires of five other non-African-American[12]
veniremembersCJurors 10, 11, 17, 39, and 43,
two of whom were seated on the juryCwho also
answered that they or a family member had had a bad experience with law
enforcement.  According to the defense,
the State=s explanation failed because it
did not strike these similarly situated veniremembers.  The trial court denied appellant=s Batson
challenge, stating, AAt this time, I=m going
to find that you failed to meet the burden of showing there was a
disproportionate number of jurors who were struck as a minority race.  I=ll find
that this is a race-neutral jury.@








Applicable Law

The Equal Protection Clause of the Fourteenth
Amendment to the United States Constitution prohibits race-based jury
selection.  U.S. Const. amend. XIV; Batson
v. Kentucky, 476 U.S. 79, 89, 106 S. Ct. 1712, 1719 (1986); Jasper v.
State, 61 S.W.3d 413, 421 (Tex. Crim. App. 2001).  When a defendant challenges the racial
composition of a jury under Batson, he or she must prove that the
prosecutor engaged in purposeful discrimination against a member of a
constitutionally protected class in exercising the State=s
peremptory challenges.  Batson,
476 U.S. at 96B98, 106 S. Ct. at 1723B24; Watkins
v. State, 245 S.W.3d 444, 447 (Tex. Crim. App. 2008), cert. denied,
129 S. Ct. 92 (2008).  The defense must
first make a prima facie case of racial discrimination (step one).  Purkett v. Elem, 514 U.S. 765, 767,
115 S. Ct. 1769, 1770B71 (1995); Watkins, 245
S.W.3d at 447.  The burden of production
then shifts to the State to come forward with a race‑neutral explanation
(step two).  Purkett, 514 U.S. at
767, 115 S. Ct. at 1770B71; Watkins, 245 S.W.3d
at 447.  If the State tenders such a race‑neutral
explanation, the trial court must then decide whether the defendant has proved
purposeful racial discrimination (step three). 
Purkett, 514 U.S. at 767, 115 S. Ct. at 1770B71;
Watkins, 245 S.W.3d at 447.








The step-two explanation need only be race
neutral on its face.  Purkett, 514
U.S. at 767B68, 115 S. Ct. at 1771; Watkins,
245 S.W.3d at 447.  The ultimate
plausibility of that race‑neutral explanation is to be considered as part
of the third step of the analysis, in which the trial court determines whether
the defendant has satisfied his or her burden to prove the strike was indeed
the product of the State=s purposeful
discrimination.  Purkett, 514 U.S.
at 768, 115 S. Ct. at 1771; Watkins, 245 S.W.3d at 447.  Whether the defendant satisfies the burden of
persuasion to show that the proponent=s
facially race‑neutral explanation for the strike is pretextual and not
genuine is a question of fact for the trial court to resolve in the first
instance.  Watkins, 245 S.W.3d at
447; Gibson v. State, 144 S.W.3d 530, 534 (Tex. Crim. App. 2004); see
Purkett, 514 U.S. at 769, 115 S. Ct. at 1771.

After the defendant has made out a prima facie
case of racial discrimination, if the trial court then proceeds immediately to
the second step by inquiring of the State whether it had a nondiscriminatory
purposeCas the
trial court did hereCa reviewing court is to assume
that the defendant has satisfied the step‑one obligation to make a prima
facie case of purposeful discrimination and address only the second and third
steps.  Watkins, 245 S.W.3d at 447B48.  The court of criminal appeals has explained
this court=s role on review of a trial
court=s Batson
ruling as follows:








The reviewing court should not overturn the trial court=s resolution of the Batson
issue unless it determines that the trial court=s ruling was clearly
erroneous.  In assaying the record for
clear error, vel non, the reviewing court should consider the entire
record of voir dire; it need not limit itself to arguments or considerations
that the parties specifically called to the trial court=s attention so long as
those arguments or considerations are manifestly grounded in the appellate
record.  But a reviewing court should
examine a trial court=s conclusion that a
facially race‑neutral explanation for a peremptory challenge is genuine,
rather than a pretext, with great deference, reversing only when that
conclusion is, in view of the record as a whole, clearly erroneous.

 

Id. at 448 (citations omitted).








In our analysis of the second and third steps, we
are guided by the Supreme Court=s recent
opinion in Miller-El v. Dretke, in which the Court Aconsidered
the combined impact of a number of factors in concluding that, by clear and
convincing evidence, the prosecutors exercised two peremptory challenges on a
racially discriminatory basis, notwithstanding the race‑neutral
explanations they offered at the Batson hearing.@  Id. (citing Miller-El v. Dretke,
545 U.S. 231, 266, 125 S. Ct. 2317, 2340 (2005)).  Among the factors the Court considered in Miller-El,
viewing the voir dire as a whole and considering the collective and cumulative
impact of those factors, were (1) statistics showing the State struck a higher
percentage of African-Americans than non-African-Americans, (2) the State=s given
reasons for striking African-American jurors appeared to apply equally to
non-African-American jurors the State did not strike, (3) evidence that the
State used jury shuffles in an attempt to manipulate the racial makeup of the
panel, (4) the State questioned African-American and non-African-American
jurors differently and in a way designed to obtain answers justifying strikes
of African-American jurors, and (5) evidence that Dallas County had a formal
policy of excluding minority jurors from service.  Miller-El, 545 U.S. at 240B64, 125
S. Ct. at 2325B39; Watkins, 245 S.W.3d
at 448B49.

Only the second factor was raised during the Batson
hearing in appellant=s case.  Accordingly, although we are not limited to
considering only those matters specifically raised at the hearing, we will
begin by undertaking a side-by-side comparison of Juror 34 with Jurors 10, 11,
17, 39, and 43.

Comparative Juror Analysis

Juror 34








Juror 34=s
questionnaire showed that she was forty years old.  She listed her occupation as ACDL
Driver Prospect.@ 
Her education was listed as AComplete
10th/w diploma.@[13]  To the question, AHave you
or someone close to you ever had an unpleasant experience with the police,@ she
answered, Aex-husband in and out of prison
for years.@ 
In response to the question, AHave you
or someone close to you ever been arrested for or charged with a crime
([i]ncluding hot checks),@ she answered, ATraffic
Ticket 1997.@ 
She had never served on a civil or criminal jury.  The only party to question Juror 34 directly
was the State, who asked, A[Y]ou=ve had
family that was involved in the criminal justice system.  Is there anything about that case that would
affect you sitting as a juror here?@  The juror responded simply, ANo.@  The State did not question her further.

Juror 10

Juror 10, a thirty-six year-old male, indicated
on his questionnaire that he was a teacher and that his wife also worked for
the same school district.  He had a
master=s degree
in Christian Education.  In response to
the question about unpleasant experiences with the police, he answered, Aolder
brother got into much trouble with DWI=s and
such - of course, I only heard his side.@  He had never served on a criminal or civil
jury.








During questioning by the State, he volunteered
the following:  AIt was
not with a deadly weapon, but my wife was raped before I met her, so she was
assaulted.@ 
When asked if he would have strong feelings about the instant case, he
stated, AWell, I
certainly have strong feelings, but I don=t know -
- I can=t say
how I would feel based on the facts in any case.@  He admitted it was possible that Athere
might be some part of the emotional part that involves violence that [he] might
have a hard time with,@ but he also added that his wife=s
assault had taken place Aa long time ago.@  The defense challenged him for cause.

On further questioning by the trial court, Juror
10 stated that what happened to his wife would not affect his judgment in the
case, that the two cases were Atotally
different,@ and that his wife=s
assault did not seem to be relevant to the instant case.  He also stated that he could be fair and
impartial to appellant and the State.

Thus, although Juror 10 also listed a close family
member with more than one unpleasant experience with the police, his brother,
he also was married to someone who had been the victim of an assault.  Additionally, when defense counsel asked who
wanted to serve on the jury, Juror 10 responded that he did.  Accordingly, we conclude and hold that there
are sufficient differences between Juror 10 and Juror 34 such that the State=s
reasoning did not apply equally as to both of them.

Juror 11








Juror 11 was fifty-eight at the time of trial,
and he listed his occupation as ARet Fed
Gov=t.@  For his educational background, he listed AAA
Degree.@  In response to the question about bad
experiences with police, he listed, AWife
arrested erroneously.  Same name &
someone with a warrant.@ 
He had also served in the United States Army and had a nephew who was a
Grand Prairie policeman.  Finally, Juror
11 had served on both a civil and a criminal jury in the past.

When the State asked whether he could be fair (presumably
in relation to having a relative in law enforcement), he stated, AI think
I could be fair.@ 
When asked if, with respect to his Aexperience,@ he
could Aput that
aside and judge each person as they came in here,@ he
said, AYes, ma=am.@  Later, Juror 11 and defense counsel engaged
in the following colloquy:

[Juror 11]:  Well, I think you have the right to defend
yourself by any means necessary to get out of the situation.

 

[Defense counsel]:        Okay.

 

[Juror 11]:  Unless it=s against law enforcement, then he has the gun
and you don=t have a right to pull a
gun against him.

 

[Defense counsel]:        Okay. 
But what if I didn=t know it was law
enforcement?

 

[Juror 11]:  Well, you should have been warned prior to.

 

[Defense counsel]:        Okay. 
So in the course of me being attacked and defending myself, I should be
more astute as to who the person is?

 

[Juror 11]:  No,
I=m not
saying that.  Law enforcement would
inform you that they=re law enforcement.

Juror 11 ultimately sat on the jury.








Unlike Juror 34, Juror 11 had a relative in law
enforcement.  And, also unlike Juror 34,
his spouse=s experience with the police was
a one-time event, not multiple encounters over a period of years.  Additionally, his wife=s
experience was one of mistaken identity and presumably did not involve prison
time.  Accordingly, we conclude and hold
that Juror 11=s characteristics that could be
considered more favorable to the State distinguish him sufficiently from Juror
34 such that the State=s failure to strike him does not
show pretense as to its striking Juror 34.

Juror 17








There is some confusion in the record regarding
Juror 17; it appears that two jurors, 17 and 20, shared the same last name.[14]  Juror 17 was 69 years old and retired from
the National Weather Service.  His wife
was retired from the ATexas Probation Dept.@  He had previously served on both a civil jury
and a criminal jury.  He listed his
education as AHigh school grad with some
college.@  In response to the question about unpleasant
experiences with the police, he stated, AI have
grandsons that are or have been in prison in Oklahoma.@  He had a nephew who was an Everman police
officer, and he had served in the United States Air Force for ten years.

In response to the State=s
questioning about whether his grandsons=
unpleasant experience with law enforcement would affect him, Juror 17 answered,
ANo,@ after
which he volunteered, AI=ve got a
nephew that=s a police officer.@  Based on the foregoing, we conclude and hold
that Juror 17=s experience with law
enforcement, in addition to his other questionnaire answers which could be
perceived as more favorable to the State, was sufficiently different from Juror
34=s such
that the State=s failure to strike Juror 17
does not show that its stated reason for striking Juror 34 was merely pretextual.

Juror 39








Juror 39, a female, was twenty-seven at the time
of trial.  She listed her occupation as
an elementary school teacher=s
assistant and ACNA Cherry Tree Residential.@  Under AEducational
Background,@ she wrote, Acollege
education.@ 
In response to the negative experience with law enforcement question,
she noted, APulled over because someone
[else] had tickets in my car and a license plate light was out.@  To the question asking if the juror or
someone close had ever been arrested for or charged with a crime, she answered,
ABoyfriend
theft by check off probation 6 yrs.@  She had never served on a jury before.  Juror 39 was seated on appellant=s jury.

Although she did not note it on her
questionnaire, when asked by the State whether her bad experience with law
enforcement would affect her as a juror, Juror 39 answered,

[Juror 39]:  No, ma=am.  I have
family in law enforcement as well as - -.

 

[State]:      So you could - - either way?

 

[Juror 39]:  Yeah.

 

[State]:      You wouldn=t be biased toward them
because of your family relationships and you wouldn=t be bais[ed] against
them because - -

 

[Juror 39]:  No.

 








Jurors 34 and 39 were similar in that they had
both had traffic-related encounters with police and had someone close to them
charged with a crime.  The record is not
developed about the extent to which this might have affected either woman; we
do not know how close Juror 34 was to her ex-husband or her feelings toward him
at the time of trial, nor do we know anything about Juror 39=s
relationship with her boyfriend.  Their
experiences could likely be distinguished on the basis that Juror 34=s ex-husband
apparently had chronic problems with the law while, in contrast, Juror 39=s
boyfriend had been out of trouble for at least six years after his
probation.  Moreover, Juror 39 said
during questioning that she had family in law enforcement.  And although she said that she would not be
biased for or against a police officer, it makes sense that the State would
favor jurors with relatives in law enforcement in a case such as this, in which
appellant was accused of assaulting a police officer.  For these reasons, we conclude and hold that
the State=s failure to strike Juror 39
does not show that its reasons for striking Juror 34 were not race-neutral or
merely pretextual.

Juror 43

Juror 43 was forty-nine years old at the time of
trial.  He listed his occupation as AMillwright
Self  Employed,@ and he
had a tenth grade education.  In response
to the negative experience with law enforcement question, Juror 43 wrote, AFriend
Agg Aus.@  He also noted that his stepson had been
arrested or charged for Adrugs.@  He had not served on a civil or criminal jury
and did not have a relative in law enforcement.








When the State asked Juror 43 whether his friend=s
experience would affect him in this case, he answered ANo.@  He also said that he could be fair to both
sides.  When the defense asked the panel
what they first thought when they heard the offense, he answered, AI feel
like I would have to have more [details].@

The similarities between Juror 43 and Juror 34
are much closer.  Both were in their
forties and had about an equal amount of education.  Neither had previously served on a jury.  Juror 43=s answers
to the law enforcement and crime questions do not indicate whether his friend=s and
stepson=s
problems were chronic or one-time, nor do they explain whether either of them
spent time in jail or prison.  However,
we do know that Juror 34=s ex-husband not only had been
arrested and charged, he was Ain and
out of prison for years.@ 
Finally, the State notes that Juror 43 was toward the end of the strike
zone and, thus, unlikely to be selected. 
In fact, he did not sit on the jury.








Although there is a much closer question as to
Jurors 34 and 43, there are at least some distinguishing characteristics
between the two.  And even if there were
not, faced with the record of the entire voir direCwhich
shows that out of three African-Americans on a panel of more than forty-three,
two sat on the jury and only one was struckCwe
cannot say that the trial court clearly erred in overruling appellant=s Batson
challenge.  See Watkins, 245
S.W.3d at 453 (holding, when State struck one African-American juror and three
non-African-American jurors for having reservations about assessing a life
sentence, but did not strike other non-African-American juror who also
expressed reservations, that A[w]e are
unable to say on this state of the record that [the African-American juror] was
struck on a basis that did not apply equally to most of the
non-African-American veniremen@
(emphasis added)).  In addition to
showing that a fairly high percentage of African-Americans actually served on
the jury, the record does not reveal a pattern of disparate questioning,[15]
nor is there any indication that the prosecutors used a jury shuffle at all,
much less for an improper purpose. 
Although the prosecutor did not question Juror 34 any further once she
said her ex-husband=s experience would not affect
her in this case, she likewise did not ask follow-up questions of at least some
of the other panel members.  Accordingly,
on this record, we conclude and hold that the trial court=s denial
of appellant=s Batson challenge was
not clearly erroneous.  We overrule
appellant=s second point.








                                             Conclusion

Having overruled appellant=s three
points, we affirm the trial court=s
judgment.

 

TERRIE
LIVINGSTON

JUSTICE

PANEL:  LIVINGSTON and MCCOY, JJ.; WILLIAM BRIGHAM
(Senior Justice, Retired, Sitting by Assignment)

 

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

DELIVERED:  March 26, 2009











[1]See Tex. R. App. P. 47.4.





[2]Although appellant=s ending prayer asks for
an acquittal on his first point, the argument under his first point deals only
with factual sufficiency and specifically requests a new trial.  Moreover, in oral argument, appellant
confined his discussion to factual sufficiency only.





[3]The officers= vehicle was parked next
to the truck, and appellant=s car was on the other side of the truck.





[4]Officer Yeager explained
that the shirt=s condition indicated A[m]edical intervention
where the ambulance personnel arrive at the scene and remove the clothing.@





[5]Officer Hull was also
wearing a T-shirt and jeans, but, like Mills, he had his badge around his neck.





[6]Isidro Salazar, Toledo=s friend and the driver
of the truck he was riding in, did not testify.





[7]Salazar clarified, AI was too far away to
hear exactly what he was saying.@





[8]According to Van Fleet,
the Fort Worth Police Department uses hollow point bullets.





[9]We address appellant=s third point out of
order because it relies in part on the facts discussed in his first point.





[10]The State contends that a
separate instruction is not required in this case because it is not a statutory
defense under the penal code.  See
Giesberg v. State, 984 S.W.2d 245, 250 (Tex. Crim. App. 1998) (A[A] defense which is not
recognized by the Legislature as either a defense or as an affirmative defense
does not warrant a separate instruction.@), cert. denied, 525 U.S. 1147
(1999).  But we need not decide whether
such an instruction is available, given our disposition of appellant=s point.  See Tex. R. App. P. 47.1.





[11]The State contends that
appellant=s Batson challenge
was untimely because the jury had already been sworn.  See Tex. Code Crim. Proc.
Ann. art. 35.261 (Vernon 2006); Hill v. State, 827 S.W.2d 860,
873B74 (Tex. Crim. App.
1992), cert. denied, 506 U.S. 905 (1992).  In these unusual circumstances, however,
appellant was apparently not able to discern the change in the panel from the
day before until the jury was actually being sworn and he could visually
examine the correct panel.  And appellant
raised his challenge immediately after the jury was sworn.  Accordingly, on these facts, and in the
interest of justice, we will address the merits of his complaint.  See Tex. R. App. P. 33.1(a)(1); Tex.
R. Evid. 103(a)(1); Lagrone v. State, 942 S.W.2d 602, 618 (Tex. Crim.
App.), cert. denied, 522 U.S. 917 (1997); Polk v. State, 729
S.W.2d 749, 753 (Tex. Crim. App. 1987). 
Moreover, because we hold that he is not entitled to relief on the
merits, our disposition is the same.  See
Tex. R. App. P. 47.1.





[12]The only part of the
record indicating the race of the veniremembers is appellant=s counsel=s statement that Afor the record . . . I do
believe they are members of the Caucasian race.@





[13]The copy of the
questionnaire is light, and it is possible the notation says, AComplete 12th/w diploma.@  Either way, it appears she has a high school
education.





[14]Although the State
contends in its brief that it Acan find no indication that there were two veniremembers
with the same last name,@ it is clear that Juror
20, whom the trial court questioned separately, had the same last name as Juror
17.  The trial court identified Juror 20
specifically after striking him for cause; Juror 20 had told the trial court
point-blank that he could not be fair and impartial in the case because his
wife had been a victim of a violent sexual assault.  Juror 17=s questionnaire has ANo@ circled in response to
the question about whether the juror or someone close had ever been the victim
of a crime.  Earlier, when the prosecutor
was asking whether panel members could be fair in light of their experiences
with the police, she asked Juror 17 if he Afelt like the process was fair or [if he] could .
. . put that aside?@  He answered, A[Y]ou may have the wrong
[person with the same last name].  I=ve got grandsons, but I
wasn=t really involved.@  When she further asked, ASo you weren=t close enough to that
for it to affect you, sitting in this room,@ he answered, ANo.@  Although
the record is somewhat confusing, it is apparent that Juror 17 and Juror 20 had
the same last name.  Accordingly, we will
not attribute Juror 20=s answers to the trial
court=s questions to Juror 17.





[15]Not knowing the
identities of the two African-American jurors who sat on the jury, we cannot
evaluate whether the lack of further questioning was limited only to
African-American jurors.